## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KARIEM ELEY,

        Petitioner,

    v.

Charles Erickson - Superintendent
Superintendent of the State Correctional
Institution at Retreat (Hunlock Creek, Pa.),
        Respondent.

No. 08-CV-90

FILED
SCRANTON

JAN 1 4 2008

PER _____
DEPUTY CLERK

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HIS PREVIOUSLY FILED PETITION FOR WRIT OF HABEAS CORPUS AND ADDRESSING THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT

Petitioner submits hereby this *Memorandum of Law in Support of his previously filed Petition for Writ of Habeas Corpus and Addressing the Applicability of the Anti-Terrorism and Effective Death Penalty Act* (AEDPA). The Memorandum sets forth petitioner's eligibility for review under AEDPA, both as to timeliness and as to that Act's standard of review, and thereafter addresses the substantive claims.

## I. APPLICATION OF THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

Congress in 1996 amended the habeas corpus statute in the Anti-Terrorism and Effective Death Penalty Act of 1996. Under AEDPA:

    (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of that claim--

        (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>           (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (West Supp. 1998).

The application of these respective provisions was set forth by the United States Supreme Court in <u>Williams v. Taylor</u>, U.S., 120 S.Ct. 1495, 1523 (2000), as follows:

> § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied -- the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

For the reasons set forth herein, petitioner is entitled to relief.

## II.     THE INSTANT PETITION IS TIMELY UNDER AEDPA

Under AEDPA, a petition must be filed within one year of either the date the judgment became final <u>or</u> one year after AEDPA became law (AEDPA took effect on April 24, 1996, so the nominal deadline in the case at hand would be April 24, 1997). The latter time period is "tolled" for any period that a "properly filed application" for state court relief is "pending." <u>Swartz v. Meyers</u>, 204 F.3d 417, 419-420 (3rd Cir. 2000).

Petitioner's direct appeal was completed on or about on January 2, 2004 at 771 Middle

District Allocatur 2003. Thereafter, on March 11, 2004, he was resentenced (as this was the only relief ordered by the Superior Court on direct appeal) with the robbery conviction being merged with the murder sentence. On December 13, 2004, he filed his P.C.R.A. petition in the state courts. Using the March 11, 2004 resentencing as the earliest date after which a P.C.R.A. could have been filed, the filing in December of 2004 tolled the running of the time for federal habeas review and left him approximately three (3) months to commence habeas.

On or about December 20, 2007, the Pennsylvania Supreme Court denied review from his appeal in the P.C.R.A., making the order denying P.C.R.A. relief final. This habeas petition, filed within the three (3) month period set forth above, satisfies the timeliness[1] requirement of AEDPA.

## III.   PROCEDURAL AND FACTUAL HISTORY

**Procedural History:**

Appellant was arrested on July 14, 2000 and charged, along with codefendants Lester Eiland and Edward Mitchell, with murder and related offenses. After two mistrials (one because of the jurors' inability to reach a unanimous verdict, and the second because a witness testified to inadmissible evidence) he was convicted at a third trial, in August, 2001, of Second Degree Murder, Robbery, and Conspiracy to Commit Robbery. Thereafter, appellant was sentenced to

---

[1]      Petitioner notes that he has a separate P.C.R.A. petition pending in the Pennsylvania courts. After the filing of the initial P.C.R.A. petition, but before it was resolved, newly-discovered evidence was submitted to the P.C.R.A. court for review. The P.C.R.A. court treated that claim separately, and it is currently before the Pennsylvania Superior Court. Petitioner requests this Court to stay any action on the instant habeas until the after-discovered evidence claim is resolved.

life imprisonment on the murder count; and consecutive sentences of seven to twenty years on the robbery charge and four to twelve years on conspiracy.

A timely notice of appeal was filed, after which(on June 19, 2002) a motion for a new trial based on after-discovered evidence was submitted to the trial court. After a remand to the Court of Common Pleas, hearings on that Motion took place on August 15, 2002; September 6, 2002; and September 17, 2002. The second hearing was explicitly for the defense to present any and all evidence; at the third hearing, set for argument, the defense belatedly attempted to offer a statement against interest made by an unavailable witness. That effort was rejected as untimely. At the conclusion of the last hearing, the motion was denied.

Direct appeal relief was denied on September 22, 2003 *except* as to the issue of sentencing, with this Court determining that it was unlawful to impose sentences on both Second Degree Murder and Robbery. Appellant sought allowance of appeal in the Supreme Court, and that was denied. Thereafter, on March 11, 2004, appellant was resentenced with the robbery conviction being merged with the murder sentence.

On December 13, 2004, instant counsel filed a P.C.R.A petition on behalf of appellant. On July 18, 2005, an evidentiary hearing was held. Thereafter, a new [the instant] motion for P.C.R.A. relief based upon after-discovered evidence was filed.[2]

On April 27, 2006, the P.C.R.A. court dismissed the December 13, 2004 P.C.R.A. Petition (the subject of the instant appeal) without acting on the second after-discovered evidence motion. Appellant appealed from that denial at No. 896 MDA 2006. This Court denied relief,

---

[2]     The timeliness of the discovery was detailed in the after-discovered evidence petition; and, at the evidentiary hearing, it was not disputed. *See* N.T. 7/27/06, 15-17.

4

and appellant has since sought allowance of appeal before the Pennsylvania Supreme Court. [As of October 10, 2007, the Supreme Court had taken no action on that application.]

The after-discovered evidence motion was the subject of two (2) evidentiary hearings, those held July 27 and September 19, 2006. After briefing, the matter was held under advisement until September 19, 2007, at which time relief was denied. This appeal was then timely filed.

**Factual History**:

**Introduction:**

In the light most favorable to the Commonwealth, evidence was adduced placing petitioner near the scene of a robbery/shooting and running away thereafter along with the two alleged active participants. No evidence placed a weapon in his hand; no evidence placed proceeds from the crime in his possession; and no evidence established that he had made any inculpatory statement. He has always maintained his absolute innocence.

Immediately after his trial, and continuing through this appeal, evidence has been unearthed that confirms petitioner's innocence. Post-trial, evidence that another person (other than petitioner and his two codefendants) possessed the firearm used in the murder within a day or two of the homicide was revealed. For this appeal, the additional information that was brought forth was that one Eugene Whitaker signed a statement, made to a defense investigator, that *he* was the person who engaged in the conduct attributed to petitioner - being the third man at the scene and running therefrom. Whitaker named two other persons (not petitioner's

codefendants) as the actual perpetrators; and one of them committed a robbery *at that same intersection* just 8 hours before this robbery/murder.

Below, petitioner provides a more complete detailing of the trial evidence and all after-discovered proof.

**Trial Testimony and Proceedings:**

On July 5, 2000, Harrisburg police responding to a 911 call found a taxi cab parked at Kittatinny Street with the driver shot in the head. One day later, the driver died. Found at the scene were .25 caliber shells. N.T. 59-64; 143; 186.[3] Of fingerprints 'lifted' from the vehicle, none matched any of the three defendants. N.T. 191-192; 499-500.

The deceased, Angel DeJesus, was a cab driver. According to his wife, on July 4th he had several hundred dollars in his possession, and at the end of the day may have had approximately $200. N.T. 140-141. At some point after his wife went to sleep in the early hours of July 5th, Mr. DeJesus left the home. N.T. 142. She subsequently learned of his having been shot. According to the wife, Mr. DeJesus had a blue pouch that he used for "keeping his money." N.T. 143. NO such pouch was returned to the wife with the effects of the deceased, and she was unable to find the pouch in the home. N.T. 143-144. However, the cab itself was returned to other members of the family of the deceased. N.T. 153-154.

Guadalupe Fonseca testified to having seen three black men near the taxi, and then seeing one of the three enter the cab, after which two shots were heard. The male who entered the cab exited it, and the three left. N.T. 208-209. Fonseca saw no one carry anything away from the cab

---

[3]     The designation "N.T. identifies the notes of testimony from the third trial, which were collected into a single set with consecutive pagination.

6

after the shooting. N.T. 238.

Jennifer McDonald claims to have seen petitioner and his two codefendants at Hummel and Kittatinny on the morning of the murder. N.T. 282-283. Some minutes later, she heard a loud noise and saw the taxicab at the location. N.T. 286, 288. McDonald, who stopped briefly when she saw the three males, saw no weapons. N.T. 312-313.

Rufus Hudson also claimed to have seen petitioner and his two codefendants at Hummel and Kittatinny in the early morning hours of July 5th. N.T. 333-334. At some point around 5 or 5:30 a.m., Hudson saw the three males "running across the street..." away from the direction of the cab. N.T. 337.-338.

On July 7th, police searched an abandoned house on Hummel Street. Found were a firearm and a shotgun. N.T. 388-391. No evidence was found linking petitioner to that address. N.T. 400-401. On July 14, petitioner was questioned by police when he came to meet them voluntarily He denied being near Kittatinny and Hummel in the preceding two weeks. N.T. 395-396; 401. However, petitioner told a defense attorney representing a man charged with a different crime that he [petitioner] had been near Kittatinny and Hummel at around 8 p.m. on July 4th. N.T. 569-570.

Matthew Levan testified to being incarcerated with Lester Eiland. According to Levan, Eiland admitted to him, while the two were playing cards, that he was the murderer of the cabby. Levan testified that codefendant Eiland told him that the idea for the crime was that of the other two guys. N.T. 425. No limiting instruction was sought or given when this testimony was presented. [Levan was shown to have also told police that he heard a different individual, not Eiland, Mitchell or petitioner, confess to the crime. N.T. 449-450; 476. At one time, he had

identified Eiland as the person who made this additional admission, but recanted that when it was proved that it could not have been Eiland. N.T. 450-457.]

Steven Taylor had also been an inmate in the Dauphin County Prison. He testified that he spoke with codefendant Eiland in prison, and that Eiland told him that

> *they* were there to rob a cabdriver...[and] somewhere, somehow, something went wrong and whatnot. Somebody ended up dead from that.

N.T. 482 (emphasis added). No limiting instruction was sought or given when this testimony was presented.

Detective Duffin testified to having interviewed Edward Mitchell. According to the Detective, Mitchell told of being *with two other persons* at Kittatinny and Hummel, around 1 a.m. on July 5th, and that all three had guns. N.T. 519. According to Duffin, Mitchell stated that "they" took the guns to a house on Hummel Street and hid them there. *Id.* Thereafter, following an objection, the trial court instructed the jury that *Mitchell's* statement could not be used against the other two defendants. N.T. 525.

**Initial After-Discovered Evidence:**

It was established that Rasheen Davis was found in possession of a .25 caliber firearm on March 9, 2001. N.T.A. 13.[4] Rasheen Davis admitted to coming in to possession of the gun "at the end of the summer in 2001." N.T.A. 15. Rasheen Davis admitted that he got the firearm from his brother, Rashawn Davis. N.T.A. 19. This firearm is the one used in the murder for which petitioner has been charged. N.T.A. 44, 49-50.

---

[4] "N.T.A." designates the notes of testimony of the three after-discovered evidence hearings held in 2002. The hearings took place on August 15, September 6, and September 17, 2002. The notes are bound in a single volume, and are consecutively paginated.

Rashawn Davis, called to testify about the gun, was *voir dired* by the trial judge about his privilege against self-incrimination. During that colloquy, Rashawn told the judge that he had *not* received the gun from any of the three defendants. N.T.A. 100. Rashawn Davis then asserted his privilege against self-incrimination. N.T.A. 101.

It was then established that Detective Duffin had interviewed Rashawn Davis in August 2002, and that Davis, who signed and handwrote the statement, admitted giving the .25 caliber firearm to Rasheen "in 2000 or 2001." N.T.A. 117-126; Exhibit DLE-2 at hearing. The trial court admitted the exhibit for identification purposes only, and not for its substance. N.T.A. 126.

At the third of the three evidentiary hearings, trial counsel for petitioner notified the court, for the first time, that he had interviewed Rashawn Davis and had a statement made by Rashawn Davis after he [counsel][ advised Davis that he could be charged with crimes arising from the possession of the firearm. N.T.A. 175-179. The trial court excluded the evidence, noting that it had allowed counsel to present evidence at the September 6 [second] hearing and finding that counsel had therefore waited too long to offer it. N.T.A. 180-181. [The statement recorded by trial counsel was appended to the P.C.R.A. Petition as Exhibit "A."]

**P.C.R.A. Evidentiary Hearing:**

At the hearing on petitioner's P.C.R.A. claims, trial counsel explained his performance as follows:

- Trial counsel's reason for not having raised a federal due process claim concerning the sufficiency of the evidence was that the issues "were framed in a way that we thought

9

would best argue Mr. Eley's case..." N.T.E. 17.[5]

- Trial counsel's reason for not having raised a federal due process claim concerning the reasonable doubt instruction was that "we thought we framed the issues as properly as we could based on the research we did and the merits of the claim." N.T.E. 19.

- Regarding the failure to present the statement of Rashawn Davis taken by trial counsel and his associate, and the failure to raise that claim on direct appeal, counsel explained that "we felt that the Court, the lower court, had made the proper ruling." N.T.E. 26.

- Trial counsel offered no explanation for his failure to object to the nature of the redacted statements or their use at trial. N.T.E. 29-30.

- Trial counsel explained that he did not object to the judge's jury charge on murder, which omitted Third Degree Murder as a possible verdict, because "we didn't think that third degree was the issue." N.T.E. 32.

- Trial counsel testified that he did not believe that any part of the trial judge's jury instruction on murder would create a presumption that a robbery had occurred. N.T.E. 33.

- Trial counsel explained that he did not object to the trial court's jury instruction regarding the use of any defendant's statement against another because "I took the instruction that the statements made by Eiland and Mitchell could be used against them and not against my client, and that, in my opinion, was good." N.T.E. 35. Counsel acknowledged that the instruction as given did not limit use of codefendant statements that were not made to

[5]     "N.T.E." designates the notes of testimony from the July 20, 2005 evidentiary hearing regarding the claims now before this Court.

the police. N.T.E. 36.

- Regarding the trial court instruction on contradictory statements of the defendants, counsel explained that he did not object because "[i]t hit me that they were talking about the people that made the statements." N.T.E. 37.

- Regarding the trial court's instruction on robbery (found at the trial record at pages 649-650), counsel opined that this instruction standing alone might have been confusing but that other instructions clarified the applicable law. N.T.E. 38-39.

## Current[6] After-Discovered Evidence:

Diane Cowan, a private investigator, interviewed Eugene Whitaker in custody at the State Correctional Facility at Retreat on September 15, 2005. Ms. Cowan told Whitaker that she was a private investigator engaged by counsel for Mr. Eley, that Whitaker was not obliged to speak with her, and that "anything he told me may be used against him at a later time and that he may be prosecuted." N.T. 7/27/06, 36-37; 38. At the completion of the interview process, Whitaker had the statement read to him line by line, admitted that it was "accurate," and signed it. N.T. 7/27/06, 40.

Whitaker's statement admitted to the following:

- Whitaker was at the murder scene;

- Two other black males, "Bliz" and "Germaine" were present;

- A taxicab was parked nearby;

---

[6] The term "current" refers, here, to the after-discovered evidence proceeding still pending in the Pennsylvania courts.

- Bliz entered the cab;

- A shot was fired;

- Bliz exited the cab holding a pistol.

- The three males ran. (Exhibit "C," *infra*).

Whitaker failed to appear at the initial hearing, although subpoenaed. The July hearing was continued, with a warrant issued for Whitaker's arrest. N.T. 7/27/06, 104.

Whitaker appeared later that same day and was taken into custody, and then again failed to appear at the commencement of the second P.C.R.A. hearing.. N.T. 9/19/06, 108-109. Whitaker then appeared, late.

At the second hearing, Whitaker denied being at the murder scene. N.T. 9/19/06, 154-156. He then denied making the statements that investigator Cowan had recorded. N.T. 9/19/06, 156-159. Whitaker did admit that he signed each page of Cowan's statement. N.T. 9/19/06, 159.

Subsequent to the Cowan interview, police interviewed Whitaker in December, 2005. In that interview he denied being at the murder scene, *and* when asked to view photographs of Germaine Velez and James Blackwell ["Bliz"] denied to the police that he recognized either one. N.T. 7/27/06, 93-94; 180-182; Hearing Exhibit Commonwealth #2. Evidence that contradicted Whitaker was as follows:

- At the September 2006 hearing Whitaker admitted that he lied to the police, and that he in fact did know Velez. N.T. 9/19/06, 147-148.

- At the September hearing, Whitaker's mother testified that "Bliz" was a regular visitor to the family home to see Eugene Whitaker. N.T. 9/19/06, 192-193.

12

Germaine Velez, called as a prosecution witness, had committed a robbery at the same intersection where the homicide occurred approximately 8 hours before this killing. N.T. 7/27/06, 128-129. He denied being one of the three homicide participants and claimed to have been at a hospital. N.T. 7/27/06, 121-124. Hospital records showed emergency room treatment for a Jermaine *Jones*, and Velez claimed those to be his under an alias he used at that time. N.T. 7/27/06. Velez did confirm that he and Whitaker were known to each other, and that he had previously sold drugs to Whitaker. N.T. 7/27/06, 128.

IV. REASONS FOR GRANTING THE WRIT

### I. The *Jackson v. Virginia* Claim

In the light most favorable to the Commonwealth, petitioner was present at, and ran from,

the scene of a crime. No evidence placed a gun in petitioner's hand; no evidence showed an

agreement, directly or inferentially, to participate in a crime; and no evidence showed petitioner

to have received any proceed from the crime (if, indeed, a robbery was proved to have occurred).

Nonetheless, although this paucity of evidence establishes a federal constitutional violation, the

Pennsylvania courts repeatedly found this to be legally sufficient to satisfy both state evidentiary

and federal Due Process standards *and* concluded that petitioner received the effective assistance

of counsel on his direct appeal. Petitioner shows, first, the nature and strength of the Due

Process claim; he then demonstrates how direct appeal counsel was ineffective.

In assessing the sufficiency of evidence as a matter of the federal constitutional due

process standard, the focus must be on whether

> after viewing the evidence in the light most favorable to the
> prosecution, *any* rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 319 (1979). As elaborated on by the Fourth Circuit,

> [t]he very existence of the *Jackson* test presupposed that juries
> accurately charged on the elements of a crime and on the strict
> burden of persuasion to which they must hold the prosecution,
> nevertheless "may occasionally convict even when it can be said
> that no rational trier of fact could find guilt beyond a reasonable
> doubt." [The test] was adopted to provide an additional safeguard
> against that possibility, and was to give added assurance that guilt
> should never be found except on a rationally supportable *"state of
> near certitude"*.

West v. Wright, 931 F.2d 262, 268 (4th Cir. 1991), reversed on other grounds, U.S., 112 S.Ct.

14

2482 (1992) *quoting* Jackson v. Virginia. This standard has been consistently applied by federal courts to reverse convictions and grant habeas relief where, as here, the evidence is both circumstantial and woefully inadequate to sustain more than a speculative judgment.

In Evans-Smith v. Taylor, 19 F.3d 899 (4th Cir. 1994), the defendant/petitioner's wife was murdered shortly after the two had breakfast together. The family dog, known to be protective of the wife was found locked away; the crime scene appeared "staged" to look like a sexual assault/robbery; and the petitioner was found to have engaged in significant acts of deceptive behavior, behavior argued by the prosecution as being consistent with a post-murder cover-up.

Rejecting this as Constitutionally insufficient, the court of appeals explained that

> what the evidence shows is that Evans-Smith was at his home the morning of the murder...In addition...we believe a rational trier of fact possibly could conclude beyond a reasonable doubt that the crime scene was staged. It is the next step - an inference that Evans-Smith was within a "state of near certitude" the perpetrator of this terrible crime - that the evidence simply cannot support.
> ...
>
> We conclude, however, that the evidence assessed in its entirety and in the light most favorable to the prosecution is not sufficient to persuade any rational trier of fact of the petitioner's guilt beyond a reasonable doubt...Evans-Smith could no doubt have acted as the prosecution contended he did...to start with the assumption that the crime was committed and then to show that each piece of circumstantial evidence can be explained in a consistent manner is fundamentally different from examining each piece of evidence and finally concluding beyond a reasonable doubt that the defendant was guilty. The prosecution has attempted to accomplish only the first alternative, not the second.

19 F.3d at 909-910. *See also,* Parker v. Renico, 506 F.3d 444 (6th Cir. 2007). These holdings require reversal here.

Petitioner acknowledges, as he must, that he is obliged to show not merely that is stance

15

is legally correct but, also, that the Pennsylvania courts' decisions were either contrary to, or an unreasonable application of, settled decisional law from the United States Supreme Court. This is the case.

The entirety of the Superior Court analysis is as follows: because petitioner was "seen together" with the codefendants before the crime, was seen "acting together [with the codefendants] when the victim was shot," and because the shooter exited the vehicle and "joined the other two men [including petitioner who then] fled the scene together[,]" the jury "could infer" a conspiracy and thus the evidence was sufficient. Commonwealth v. Eley, Superior Court of Pennsylvania, No. 1667 MDA 2001 (September 22, 2003), Memorandum Opinion at 7.

Errors pervade this analysis. There was no "*acting* together" during the crime other than petitioner's *standing* nearby and running away after the fact. The failure to acknowledge this "fact" resulted "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings[,]" 28 USC §2254(d)(2), and thus permits *de novo* review and a grant of relief.

Separately, a merits analysis shows the Superior Court's decision to be either contrary to, or an unreasonable application of, settled United States Supreme Court precedent. The patent unreasonableness of the Superior Court's decision is shown, first, by application of Parker v. Renico, 506 F.3d 444 (6th Cir. 2007). There, as here, a state court relied upon flight and proximity to support a finding of guilt; and there, as here, such a speculatively-based analysis was rejected under both *Jackson* and AEDPA. *Id. See also*, Brown v. Palmer, 441 F.3d 347, 352 (6th Cir. 2006) (finding proof of Brown's presence at the scene and having some acquaintance with the perpetrator insufficient to meet the *Jackson* standard; and finding state court error in

16

concluding to the contrary even under the deferential AEDPA standard); Juan H. v. Allen, 408

F.3d 1262, 1277 (9th Cir. 2005) (similar facts and result).[7]

Indeed, it is noteworthy here that the Superior Court cited *no* decisional law on this issue.

Had it turned to controlling Pennsylvania law (which embodies the *Jackson* standard) it would

have been obliged to acknowledge the deficiency in proof. *See, e.g.*, Commonwealth v. Johnson,

513 A.2d 476 (Pa.Super,. 1986) and Commonwealth v. Brady, 560 A.2d 802 (1989).[8]

No decision applying the *Jackson* standard has upheld a conviction with evidence as

---

[7]    The "perfunctory" treatment of the sufficiency claim by the Pennsylvania Superior Court also supports the claim of unreasonableness. Mitchell v. Prunty, 107 F.3d 1337, 1340 n.3 (9th Cir. 1997).

[8]    Johnson is particularly compelling. There, as here, the appellant was one of a small group of males. One yelled the command for the victim to be shot; a second male fired; and Johnson ran off with the offenders. As this Court explained,

> The evidence at trial establishes nothing more than that -- mere presence on the part of appellant. We find no testimony that sustains the proposition that appellant did anything criminal. Instead, there was exculpatory and not incriminatory evidence. Before and during the actual crime, appellant played no active role. Rather, he was passive. We cannot, no matter how horrendous the crime, convict a man who did not actively participate, but merely watched as the crime took place. We need something more, which is missing from the present case.

> The Commonwealth argued the existence of a conspiracy and the theory of accomplice liability. In proving this, however, there was no overt evidence of an agreement that included Johnson in which he assented to go along with the commission of the crime. While it is true that a conviction may be based on circumstantial evidence alone, it may not be based solely on inference, suspicion and conjecture. That is precisely what was done in this instance

513 A.2d at 478.

lacking as that in the case at hand. Both because of the unreasonable factual determination (entitling petitioner to *de novo* review) and under the exacting deferential standard of AEDPA, relief (to wit, discharge from custody) should be granted.

## Appellate Ineffectiveness

Petitioner's counsel on direct appeal raised this claim as one of evidentiary insufficiency without specifically invoking federal Due Process language or caselaw. Accordingly, on P.C.R.A. petitioner raised the claim anew as one of the ineffective assistance of direct appeal counsel to ensure that his claim could be reviewed upon habeas. On P.C.R.A. appeal, the Pennsylvania Superior Court found the federal claim to have been properly raised on the direct appeal. Commonwealth v. Eley, No. 896 MDA 2006 (May 4, 2007), Memorandum Opinion at 9.

Nonetheless, to ensure his eligibility for review, petitioner explains here that if the federal claim was not properly preserved on direct appeal his trial/appellate counsel was ineffective *and* he meets the AEDPA standard for relief.

Petitioner notes here a simple and indisputable proposition: appellate ineffectiveness is a discrete legal claim from the underlying already-litigated claim, and thus cognizable on P.C.R.A.:

> [I]neffectiveness claims are distinct' from those claims that are raised on direct appeal. The former claims challenge the adequacy of representation rather than the conviction of the defendant. Accordingly, we are persuaded by Appellant's position that a Sixth Amendment claim of ineffectiveness raises a distinct legal ground for purposes of state PCRA review under §§ 9544(a)(2). Ultimately, the claim may fail on the arguable merit or prejudice prong for the reasons discussed on direct appeal, but a Sixth Amendment claim raises a distinct issue for purposes of the PCRA and must be treated as such. Cf. Commonwealth v. Gribble, 580 Pa. 647, 863 A.2d 455, 462 (Pa. 2004) (noting alternatively that

even if the ineffectiveness claim was not previously litigated, the severance theory underlying the claim of ineffectiveness fails for the same reason the Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) theory failed on direct appeal). n10 For these reasons, we believe that a PCRA court should recognize ineffectiveness claims as distinct issues and review them under the three-prong ineffectiveness standard announced in Pierce. n11 Consistent with this standard, the petitioner must establish that: (1) the underlying claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of that counsel's deficient performance. Pierce, 527 A.2d at 976-77.

Commonwealth v. Collins, 888 A.2d 564, 573 (Pa. 2005).

Here, the ineffectiveness is palpable. In the direct appeal, counsel cited[9] one (1) state law decision in support of his claim of evidentiary insufficiency, and never directed this Court to its own compelling precedent, e.g., Commonwealth v. Johnson, 513 A.2d 476 (Pa.Super,. 1986) and Commonwealth v. Brady, 560 A.2d 802 (1989).[10] Counsel never cited to either the

---

[9]    See Commonwealth v. Eley, No. 1667 MDA 2001, Brief for Appellant, 25-27.

[10]    Johnson is particularly compelling. There, as here, the appellant was one of a small group of males. One yelled the command for the victim to be shot; a second male fired; and Johnson ran off with the offenders. As this Court explained,

    The evidence at trial establishes nothing more than that -- mere presence on the part of appellant. We find no testimony that sustains the proposition that appellant did anything criminal. Instead, there was exculpatory and not incriminatory evidence. Before and during the actual crime, appellant played no active role. Rather, he was passive. We cannot, no matter how horrendous the crime, convict a man who did not actively participate, but merely watched as the crime took place. We need something more, which is missing from the present case.

    The Commonwealth argued the existence of a conspiracy and the theory of accomplice liability. In proving this, however, there was no overt evidence of an agreement that included Johnson in which

19

Constitutional guarantee of Due Process or to <u>Jackson</u> and its progeny, all of which support petitioner's case.

This failure had two profound prejudicial impacts. First, it denied petitioner a ground for relief that is unassailable. Second, it could have operated to deprive petitioner of review of the legal sufficiency claim on federal review, as the failure to articulate a federal constitutional ground for a claim can operate to deny a federal court of jurisdiction. *See generally*, <u>Duncan v. Henry</u>, U.S., 115 S.Ct.887 (1995):

> "In his direct appeal in state court, Henry did not label his claim a federal due process violation; he argued rather that Hackett's testimony was erroneously admitted because irrelevant and inflammatory, and that its admission resulted in a 'miscarriage of justice' under the California Constitution. However, to state a federal due process claim it is not necessary to invoke 'the talismanic phrase "due process of law"' or cite 'book and verse on the federal constitution' . . . ." Id., at 1040 (citations omitted).

> In Picard v. Connor, 404 U.S. 270, 275, 30 L. Ed. 2d 438, 92 S. Ct. 509 (1971), we said that exhaustion of state remedies requires that petitioners "fairly present" federal claims to the state courts in order to give the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights" (some internal quotation marks omitted)...

> Picard and Harless control the outcome in this case. Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment...The state court, when presented with

_____

> he assented to go along with the commission of the crime. While it is true that a conviction may be based on circumstantial evidence alone, it may not be based solely on inference, suspicion and conjecture. That is precisely what was done in this instance

513 A.2d at 478.

> respondent's claim of error under the California Evidentiary Code, understandably confined its analysis to the application of state law.

Petitioner acknowledges, as he must, that he must prove both unreasonable performance and prejudice. The former is established simply. At the P.C.R.A. evidentiary hearing, counsel offered no explanation for his failure to allege a Due Process violation, stating only the conclusory assertion that the issues "were framed in a way that we thought would best argue Mr. Eley's case..." N.T.E. 17. Counsel provided no meaningful discussion of what law he researched, what conclusions he drew, or any justification for *not* preserving an independent federal claim.

The final Strickland prong, prejudice, is clear in two regards. Had these federal authorities been pled and briefed, there is a fair probability that an appellate reversal would have obtained. Separately, and indisputably under <u>Duncan</u>, the failure of direct appeal counsel operates to deny petitioner of his right to habeas review of this claim. Accordingly, petitioner has pled and satisfied the Strickland requirements.

Because petitioner is legally innocent, he was undeniably prejudiced by counsel's failure, which may leave him consigned to a term of life imprisonment without possibility of parole. Accordingly, the Pennsylvania courts should be reversed on this issue.

## II. The Reasonable Doubt Jury Instruction Claim

At petitioner's trial, the judge charged the jury that, in deciding whether there was a reasonable doubt, it should set aside the facts that were not proved beyond a reasonable doubt and then see if there was proof of the elements of the offense. Pp. 672-673. More specifically, the jury was told that

21

> Was Francisco Ramirez telling the truth? Was Contreras telling
> the truth? These are all things for you to consider. **But if you're
> able to take those issues and put them over here on the shelf
> _and still from all of the other evidence find that the
> Commonwealth has proven the Defendant...guilty beyond a
> reasonable doubt of any one of these charges on the totality of
> the evidence, you don't let a reaosnabkle doubt about one of
> these side issues prevent you from reaching a verdict in this case._**

On direct appeal, the Superior Court majority held that "[n]othing in these instructions supports
[petitioner's] claim that the trial court ordered the jury to disregard the possibility that someone
other than [petitioner] and his co-defendants shot the victim." Commonwealth v. Eley, Superior
Court of Pennsylvania, No. 1667 MDA 2001 (September 22, 2003), Memorandum Opinion at
14. In dissent on this issue, Judge Todd wrote that these instructions "suggested...that certain
issues, such as the credibility of witnesses who claimed to be at the scene..., were irrelevant and
need not be resolved in order to convict [Petitioner]." Commonwealth v. Eley, Superior Court of
Pennsylvania, No. 1667 MDA 2001 (September 22, 2003), Dissenting Memorandum Opinion at
2. Judge Todd found the instructions "unclear, confusing and prejudicial[.]" _Id._, at 3.

Here, again, the Superior Court analysis is either contrary to or an unreasonable
application of settled decisional law of the United States Supreme Court. The instruction, as
stated, runs afoul of the command of In re Winship, 90 S. Ct. 1068 (1970) and Sandstrom v.
Montana, 99 S. Ct. 2450 (1979) as it impermissibly reduces the prosecution burden of proof.
The Superior Court ignored the Constitutional standards for evaluating reaosnable doubt jury
instruction error:

> Our cases, understandably, do not provide a single standard for
> determining whether various claimed errors in instructing a jury
> require reversal of a conviction. In some instances, to be sure, we
> have held that "when a case is submitted to the jury on alternative

theories the unconstitutionality of any of the theories requires that the conviction be set aside. In those cases, a jury is clearly instructed by the court that it may convict a defendant on an impermissible legal theory, as well as on a proper theory or theories. Although it is possible that the guilty verdict may have had a proper basis, "it is equally likely that the verdict . . . rested on an unconstitutional ground," and we have declined to choose between two such likely possibilities.

In this case we are presented with a single jury instruction. The instruction is not concededly erroneous, nor found so by a court, as was the case in Stromberg v. California, 283 U.S. 359 (1931). The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction.

Boyde v. California, 494 U.S. 370, 379-380 (U.S. 1990).

Here, there were conflicting jury instructions, and the Pennsylvania Superior Court never addressed this phenomenon, thus making the *Stromberg* standard apply. Yet even if this Court were to hold the instruction here as a single, potentially ambiguous one, the Pennsylvania court erred by not applying the "reasonable likelihood" standard of Boyde. As the Superior Court applied neither standard, the review should be *de novo*; and under any standard of review, the incompatibility of the trial court's charge with the Constitutional mandate of *Winship* should require the grant of habeas relief. *Compare*, Brown v. Greene, 2007 U.S. Dist. LEXIS 34460 (decided May 11, 2007) (granting habeas relief for a flawed reasonable doubt instruction); United

States v. Wheeler, 930 A.2d 232 (D.C. App. 2007) (finding plain error where jury instruction explained that lack of evidence could not establish a reasonable doubt, to wit, that "the absence of any fingerprint evidence, standing alone, does not constitute reasonable doubt as to the firearm charges here").

### III. After-Discovered Evidence and Counsel's Ineffectiveness

Prior to petitioner's final[11] trial, police arrested one Rasheen Davis with a firearm; subsequent to the trial, a ballistics assessment determined this to be the murder weapon in this prosecution. At an after-discovered evidence hearing, Rasheen Davis testified that he had received the firearm from his brother Rashawn Davis in 2000; and police and trial counsel then interviewed Rashawn. Rashawn admitted to trial counsel[12] or his representative/agent that he [Rashawn] was in possession of the gun on the very date of the murder. Nonetheless, when Davis asserted his privilege against self-incrimination at the post-trial evidentiary hearing, trial counsel failed to prove the existence and contents of the law-office interview with Rashawn Davis; and further failed to provide caselaw supportive of the contention that the statement by Rashawn made to counsel satisfied the legal test as a Declaration Against Interest. Counsel thereafter failed to raise this claim on direct appeal. This was error that entitles petitioner to habeas relief.

### Merits Analysis

A defendant has certain fundamental rights under the United States Constitution. Among

---

[11]     Petitioner's first two trials terminated prior to verdict.

[12]     Trial counsel's office memorandum of this call is appended here as Exhibit "A,"
*infra.*

them are the rights to (a) present reliable evidence supportive of his/her defense, *see* Chambers v. Mississippi, 410 U.S. 284, 302, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973) (when a hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense the exclusion of that statement will rise to the level of a constitutional due process violation); and (b) present proof that a person other than the accused committed the crime. Holmes v. South Carolina, U.S., 126 S.Ct. 1727 (2006).

Here, the evidence of Rashawn Davis' admissions to counsel was admissible as a matter of constitutional right. As was noted above, a state evidentiary rule cannot preclude admission of reliable evidence supportive of a claim of innocence. Chambers, *supra*. In finding out of court statements reliable and thus admissible *despite any state evidentiary rule to the contrary*, the Chambers Court noted:

> First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case -- McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest.

93 S.Ct. at 1048 (footnote omitted). In the case at hand, Davis made statements to law enforcement *and* to defense counsel. Additionally, while McDonald had a *similar* firearm, Davis had the actual gun used in this murder. Thus, Davis' statements are at least as reliable as those deemed admissible in Chambers.

This bedrock Constitutional principle, is not an isolated holding but in fact has been

similarly applied throughout the country. Chia v. Cambra, 281 F.3d 1032 (9th Cir. 2002). *See also*, United States v. Camacho, 188 F.Supp. 429 (S.D.N.Y. 2002); Morales v. Portuondo, 154 F.Supp.2d 706 (S.D.N.Y. 2001); People v. Tenney, 2002 Ill. LEXIS 310 (Illinois, 4/18/2002) (reversing capital murder case where admission by another person that he committed the murder, made to an acquaintance, was excluded). As the Illinois Court explained:

> In this case, the trial court did not consider Lane's hearsay statement to be corroborated. However, the record contains evidence, independent of Mohle's testimony, that corroborated Lane's hearsay statement. Lane told Mohle that he, with Salter and Jenkins, entered the victim's residence looking for items to steal. The State presented evidence that the victim's home was broken into and that personal property was stolen. Lane told Mohle that there was a lone woman present when they entered the house; the State presented evidence that the victim was at home and there was no evidence of any other occupant or visitor. Lane told Mohle that Salter shot the woman in the house; the State presented evidence that the victim was shot. In addition to this evidence, it must be remembered that Mohle gave this testimony at Lane's trial, under oath and subject to cross-examination. Mohle testified that Turner drove a brown car on the night of the homicide; it was stipulated that the victim's neighbors saw a dark-colored vehicle pull up into the victim's driveway. Also, Mohle identified the victim's residence as the house where the murder occurred. Lane's hearsay statement was corroborated as contemplated by *Chambers*. Our conclusion is in accord with other decisions in which extrajudicial declarations inculpating the declarants and exculpating the defendants were found to be sufficiently corroborated to be admissible as declarations against penal interest. See, *e.g.*, United States ex rel. Gooch v. McVicar, 953 F. Supp. 1001, 1009-10 (N.D. Ill. 1997); Thomas v. State, 580 N.E.2d 224, 227 (Ind. 1991); Lacy v. State, 700 So. 2d 602, 607-08 (Miss. 1997); People v. Robinson, 267 A.D.2d 336, 337, 700 N.Y.S.2d 203, 204 (1999); Davis v. State, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994).

Here, Davis was "clearly aware of the *possibility* that [his] disclosure would lead to prosecution...and [his] statement was made to a reliable person of authority under circumstances

that would assure trustworthiness and reliability." Indeed, at the time the statement was taken, counsel for petitioner discussed with Rashawn the fact that the questioning was in relation to a murder.

Ineffective Representation

Counsel had, in his file, the written confirmation that Davis had admitted, against his interest, to possession of the murder weapon *at or near the time of the crime's commission*. Yet counsel failed to call himself or a colleague from his office as a witness, or otherwise prove the statement's existence and contents. When his belated[13] attempt to introduce the proof was rebuffed as out of time, counsel failed to preserve the claim on direct appeal review.

With such a compelling body of law, there could have been no tactical basis for trial counsel's omission at the post-trial hearing. And the prejudice to petitioner is clear - in a case where evidence showed minimal conduct on his part and where no witness identified him as a shooter or otherwise direct participant, evidence of the murder weapon being in the hand of another person is compelling proof of innocence.

Similarly, there was no tactical reason for counsel to fail to raise this claim on direct appeal. On direct appeal, counsel raised a sufficiency of evidence claim and various evidentiary and procedural rulings. Other than the sufficiency claim and one involving the reasonable doubt charge to the jury, none had greater merit than, or merit equal to, the instant claim. As well, there

---

[13]    At the third of the three evidentiary hearings, trial counsel for petitioner notified the court, for the first time, that he had interviewed Rashawn Davis and had a statement made by Rashawn Davis after he [counsel][ advised Davis that he could be charged with crimes arising from the possession of the firearm. N.T.A. 175-179. The trial court excluded the evidence, noting that it had allowed counsel to present evidence at the September 6 [second] hearing and finding that counsel had therefore waited too long to offer it. N.T.A. 180-181. [The statement recorded by trial counsel was appended to the P.C.R.A. Petition as Exhibit "A."]

is no showing that counsel made a deliberate weighing before omitting this claim.

> Strategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable;
> and strategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation. In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations
> unnecessary. In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all
> the circumstances, applying a heavy measure of deference to
> counsel's judgments."

Wiggins v. Smith, U.S., 123 S. Ct. 2527, 2535 (2003). As well, it is now clear in Pennsylvania

that counsel on direct appeal has the obligation to raise all viable preserved issues.

Commonwealth v. May, 898 A.2d 559 (Pa. 2006).

What counsel did here was to deprive his client of a claim of proof of innocence, one with

clearly admissible evidence, with no research or other strategic justification. Rather, and clearly,

it was a product of sloth.

### The Lower Courts' Analyses

This claim was dismissed on its merits by the P.C.R.A. Court. The P.C.R.A. Court never

addressed counsel's failure to properly introduce the Davius statement; it instead focused solely

on the decision of counsel to not include this claim on direct appeal. It conducted no discussion

of the ample federal constitutional law cited here (and in the court below); it concluded that the

statement was inadmissible because it was not against Davis' interest; and it invented a new

standard, arguing that the statement is inadmissible because counsel gave no *Miranda* warnings.

OPINION, 8.

This analysis is due no deference on habeas review. First, it is factually erroneous, as it

omits the following proved facts from its assessment:

- The firearm in question had an obliterated serial number and Rashawn Davis bought it illegally on the street[14], so that any questioning about the gun had to carry with it notice that answers to questions regarding possession could be against the declarant's interest.

- At the time the statement was taken, counsel for petitioner discussed with Rashawn the fact that the questioning was in relation to a murder.

Thus, the lower court's analysis resulted "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings[,]" 28 USC §2254(d)(2), and thus permits *de novo* review and a grant of relief.

Even without *de novo* review, the P.C.R.A. Court's analysis is contrary to and/or an unreasonable application of settled federal law. What eluded the P.C.R.A. Court was the core right to present evidence that someone other than the defendant committed the crime. Holmes v. South Carolina, U.S., 126 S.Ct. 1727 (2006). In Holmes, the Court first stated the general principle that the Constitution bars states from excluding evidence of third party culpability:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"

---

[14]     Indeed, when Rashawn Davis appeared in court and asserted his privilege against self-incrimination, the P.C.R.A. Court found ample grounds for fear of self-incrimination arising from these very facts.

A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. See, e.g., 41 C. J. S., Homicide §§ 216, pp 56-58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am. Jur. 2d, Homicide §§ 286, pp 136-138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" (footnotes omitted)). Such rules are widely accepted, and neither petitioner nor his amici challenge them here.

126 S. Ct. at 1732-1733 (citations omitted). In ruling that counsel *was* effective in not pursuing this claim on direct appeal, the P.C.R.A. Court failed to acknowledge that counsel failed to recognize, properly research, and pursue an appellate issue of great weight.[15] Petitioner, accordingly suffered deficient performance and prejudice.

The Pennsylvania Superior Court made *no* merits analysis of this claim, erroneously stating that the case had never been properly remanded to the trial court for the evidentiary hearing. This is error. As petitioner detailed when he sought reconsideration in the Superior Court,

Appellant suggests that this Court overlooked a critical fact, to wit, that the matter was remanded to the lower court while the appeal

---

[15] Regarding the failure to present the statement of Rashawn Davis taken by trial counsel and his associate, and the failure to raise that claim on direct appeal, counsel explained that "we felt that the Court, the lower court, had made the proper ruling." N.T.E. 26. Counsel cited to no caselaw, research or rule of evidence to support this *post-hoc* assertion.

was pending precisely so the evidentiary hearing could be conducted. This procedural fact, set forth in the Statement of the Case in appellant's initial Brief, is found in the notes of testimony from the evidentiary hearing, where the Commonwealth stated this of record:

> Your Honor, the Defense counsel, counsel for Edward Mitchell and Karim Eley, have filed motions for a new trial pursuant to after-discovered evidence. The cases were currently pending on appeal before the Superior Court.
>
> They had filed motions, with that court granting a stay, and the cases were remanded to this court in order to dispose of their motions for after-discovered evidence.

TRANSCRIPT OF PROCEEDINGS: HEARING - AFTER DISCOVERED EVIDENCE, statement of Deputy District Attorney Michael Consiglio, 8/15/2002, p. 5 (emphasis added).

Nothing in the Superior Court decision precludes a grant of habeas relief on this claim.

## IV. The "Redaction" Instruction Claim

The only evidence potentially inculpatory to petitioner, other than his presence at the scene, his flight, and his one statement disavowing having been at the scene, came through the mouths of his codefendants *post-arrest*. Trial counsel sought severance, but when that was denied failed to seek proper redaction or limiting instructions. [In fact, on direct appeal counsel accepted the validity of the statements as redacted.[16]] On these issues, as well as the jury instruction claims discussed below, petitioner was deprived of effective counsel.

Redaction

---

[16]     *See* Commonwealth v. Eley, No. 1667 MDA 2001, Brief for Appellant, 16.

31

Petitioner's jury heard testimony of statements made by his two codefendants. Police Investigator Brown testified that codefendant Mitchell stated that he [Mitchell] was in the area of the crime with two other persons, and that "they" had and hid guns. Witness Matt Levan testified that codefendant Eiland told him, in jail, that Eiland was the shooter but that the idea for the crime was that of the other two guys. Witness Steve Taylor testified that codefendant Eiland stated that "they" were there for a robbery. When the trial court finally gave a limiting instruction, it did so only regarding statements made by codefendant Mitchell (N.T. p. 525); no such instruction was given regarding the statements of codefendant Eiland until the conclusion of trial, and (as is demonstrated below), the instruction was incomplete and misleading.

## Merits Analysis

In not moving for a more complete redaction, or objecting to the instant redaction or presentation of these statements, and in not objecting to prosecutorial use of the codefendants' statements against petitioner or the trial court's untimely and inadequate instruction, counsel was ineffective. There was no strategic basis for these omissions, and petitioner was prejudiced as these statements linked him to the planning and execution of this crime.

Beginning with the landmark decision in <u>Bruton v. United States</u>, 88 S.Ct. 1620 (1968) and culminating in <u>Gray v. Maryland</u>, U.S., 118 S.Ct. 1151 (1998), the United States Supreme Court has forbidden use of a non-testifying codefendant's confession as evidence of a defendant's guilt. The guiding principles of law that emerged from <u>Bruton</u> and its progeny are as follow:

> § Where a non-testifying codefendant's statement implicates the
> accused, an instruction telling jurors to not use the statement
> against the accused is inadequate and deprives the defendant of the

right of confrontation. <u>Bruton</u>, 88 S.Ct. at 1628 ("in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction").

§ Where the codefendant's statement is revised to eliminate <u>all</u> reference to the existence and conduct of the accused that there is no potential <u>Bruton</u> violation. "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." <u>Richardson v. Marsh</u>, U.S., 107 S.Ct. 1702, 1709 (1987).[17]

§ Where the codefendant's statement is redacted, it will still be deemed to implicate the accused, and deprive the accused of Confrontation rights, where the statement makes reference to the accused's existence and conduct by substituting a nickname, descriptive term, or highlighting a deletion. <u>Gray</u>, 118 S.Ct. at 1156 ("redactions that replace a proper name with an obvious blank, the word "delete," a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton's* unredacted confessions as to warrant the same legal results").

---

[17]     <u>Richardson</u> finds no Confrontation violation where the only way a defendant is implicated is contextually. That occurs when the codefendant's statement makes <u>no</u> mention of the defendant *or the activities of the defendant*, but other evidence links the defendant to a fact contained in the codefendant's statement. In <u>Richardson</u> the codefendant's statement explained that a discussion about a murder took place during a car ride *but the statement never mentioned that Marsh was in the car*. Since other testimony (Marsh's own) placed her [Marsh] in the car, no Confrontation violation occurred although the codefendant's statement referenced incriminating acts that occurred during the car ride *because* a proper limiting instruction satisfied Confrontation concerns in that fact-specific situation. 107 S.Ct. at 1707.

The doctrine of "contextual implication" is inapposite here for two discrete reasons. First, in the case at hand the codefendants' statement did include details of conduct attributable to petitioner, thus rendering it unlike the <u>Marsh</u> situation. Second, the <u>Marsh</u> court remanded the matter to assess whether the prosecutor deprived Marsh of her Confrontation right by arguing the contents of the codefendant's statement as evidence against Marsh. 107 S.Ct. at 1709 ("In the present case, however, the prosecutor sought to undo the effect of the limiting instruction by urging the jury to use Williams' confession in evaluating respondent's case"). As this precise infraction occurred here, <u>Marsh</u> confirms the Confrontation violation.

An additional doctrinal aspect of Confrontation analysis is apposite here. One must look to the purpose for which the non-testifying defendants' statements were admitted. As the Pennsylvania Supreme Court has explicated, if those statements were admitted to seek petitioner's conviction, then a traditional Confrontation Clause analysis applies and the statements are inadmissible unless they meet an established hearsay exception demonstrative of their reliability. It is only where the statements are introduced solely against their respective declarants that the Bruton/Gray analysis applies.

> In order to protect these rights, the Court has developed different analyses under the Confrontation Clause depending on how a statement is used at trial. For example, **where a hearsay statement, given by a non-testifying declarant, is offered as evidence to establish the guilt of the non-declaring defendant, the court must consider whether it was admitted pursuant to either a "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness."** Only if the hearsay statement was admitted under such circumstances will such a statement be deemed to respect the non-declaring defendant's right of confrontation. On the other hand, where a hearsay statement is not admitted against the non-declaring co-defendant as evidence, then the court must consider whether sufficient precautions have been taken to insulate the non-declaring co-defendant from spillover prejudice due to the admission of the hearsay statement...Thus, **in order to determine what Confrontation Clause analysis is proper in this case, we must initially consider whether the hearsay evidence, Elliott's statement to Schneyder, was offered to establish the guilt of Appellant, the non-declaring co-defendant.**

Commonwealth v. Overby, Pa., 809 A.2d 295, 300-301 (2002) (citations omitted). Here, the prosecution used codefendant Mitchell's statement against all defendants, thus requiring the first-prong 'reliability' analysis.

### 1. Inadmissible Hearsay

34

Here, the prosecution used codefendant Mitchell's statement statement to establish the guilt of <u>all</u> defendants.[18] Because of this, and pursuant to <u>Marsh</u>, the initial Confrontation inquiry is clear and simple - unless the codefendant statements meet a recognized hearsay exception or otherwise have internal indicia of reliability, they are inadmissible. <u>Lilly v. Virginia</u>, U.S., 119 S.Ct. 1887 (1999); <u>Idaho v. Wright</u>, U.S., 110 S.Ct. 3139 (1990); <u>Ohio v. Roberts</u>, U.S., 100 S. Ct. 2531 (1980).

They do not. As the <u>Lilly</u> court determined, a criminal accomplice's statement to police is paradigmatically untrustworthy. 119 S.Ct. at 1900-1901. Particularly as at least one statement was a prototypic blame-shifting statement, reliability cannot be found and this use of inadmissible, unreliable hearsay deprived petitioner of his Confrontation rights.

### 2. Bruton/Gray Violations

Under strict application of <u>Gray v. Maryland</u>, *supra*, petitioner is separately entitled to relief. Rather than delete references in each statement to the conduct of the other defendants, the statements here, with their references to "three" or the robbery being the idea of the other two guys, clearly implicate petitioner in a case where there were only three defendants - hence the jury was aware that each statement acknowledged participation of three persons.

Here, each statement made clear that three (3) men (the precise number in the courtroom)[19] participated in the crime; as pertains to this case-specific error.

---

[18]    The prosecutor's closing argument explicitly used Mitchell's words against all three defendants. P. 624.

[19]    This problem is highlighted in the next Argument section, that titled **"Impermissible Substitution."** *See* discussion of <u>United States v. Gonzalez</u>, 183 F.3d 1315 (11th Cir. 1999) (finding error where reference to "4[th]" person highlighted the 4 defendants in the courtroom).

Even without reference to the insertion of a "blank" or mention of the word "redacted," the use of terms indicating three people and that then other two (one of whom was petitioner) planned the robbery violated <u>Bruton</u>, <u>Gray</u>, and the Confrontation guarantee. The reasoning is simple and clear - these terms smack of being substitutes, replacements for names, and thus 'tell' the jury that the statement has been redacted and/or that it implicates the non-declarants who are present in the courtroom..

This analysis draws upon post–<u>Gray</u> decisional law, both federal and state. In those cases where replacement of a name has been upheld, the substituted term is so ordinary and conversational that it appears as if the declarant himself/herself used that phrase in the actual confession. Thus, for example, some courts have approved substitution of the term "another person" or "another individual" precisely because it masks redaction.

> We see, first of all, a difference in kind. The confession in [Gray] had quite obviously been redacted, a circumstance that the Court found pointed a finger directly at the defendant. In our case, by contrast, there was no indication whatever that there had been a redaction: Mr. Roan's statement was an oral one, and the detective simply testified that Mr. Roan said that "another individual" had been in on the planning and commission of the offense. For all the jury knew, these were Mr. Roan's actual words, not a modified version of them.

<u>United States v. Logan</u>, 210 F.3d 820, 823 (8th Cir. 2000). *See also*, <u>United States v. Verduzco-Martinez</u>, 186 F.3d 1208, 1213-14 (10th Cir. 1999) (use of "another person" did not violate Confrontation Clause); <u>United States v. Akinkoye</u>, 174 F.3d 451, 457 (4th Cir. 1999) (use of "another person" and "another individual" did not violate Confrontation Clause). By contrast, the terms "three" and "the other two" are not neutral. They identify the specific number of participants and thus implicate petitioner.

In <u>United States v. Gonzalez</u>, 183 F.3d 1315, 1322 (11th Cir. 1999), this precise

occurrence mandated the grant of a new trial because it violates <u>Bruton</u> and the Confrontation

guarantee.

> As redacted, the confession was not initially clear whether anyone
> other than Gonzalez and the Colombian were involved in the
> assault on Camacho's family. Then, the prosecutor, reading from
> the transcript, said: "The Colombian was there at the house. He
> was the fourth person?" R. Vol. 7, p. 171. This is dangerously close
> to a confession that reads "Me, deleted, deleted, and the
> Colombian," which would obviously violate *Gray*. As in *Gray*, the
> jury in this case could readily infer that the two others referred to in
> the confession were seated at the defense table; specifically,
> Santiago and Claudio. The rationale underlying the Supreme
> Court's decision in *Gray* requires finding a *Bruton* violation on
> facts such as these, where a redacted confession implicates a
> precise number of the confessor's codefendants.

*See also*, <u>Jefferson v. State</u>, 2004 Ark. LEXIS 726 (Ark., 2004).

Petitioner does not concede that the substitution of generic terms (the 'neutral pronoun'

doctrine of "another person" or "another individual" or similar terminology) is constitutionally

acceptable. Indeed, some courts have found this palliative just as problematic. *See, e.g.*, <u>United

States v. Eskridge</u>, 164 F.3d 1042, 1044 (7th Cir. 1998) ("Clearly, the use of Pointer's confession

with the word "another" in place of Eskridge's name falls within the class of statements described

in Gray as violative of Bruton"); <u>State v. Davis</u>, 528 S.E.2d 800, 805 (Ga. 2000) (replacing

codefendants' names with "someone" and "anyone" violate <u>Bruton</u>);

As the Georgia Supreme Court explained,

> Because Davis's statement was admitted in evidence after the
> state's eyewitnesses identified Hill as the shooter and testified that
> after firing his gun multiple times he reloaded it, it is likely that the
> jury immediately recognized Hill as the "someone" whom Davis
> contended shot the victim until the gun was empty and then

37

> reloaded. The likelihood that the jury attributed these actions to
> Hill is increased by the fact that although the eyewitnesses
> identified three men involved in the murder, Davis did not
> implicate himself in his statement or his interview. Thus, Davis's
> statement left the jury to choose between Hill and Guy as the
> shooter.

This is the precise paradigm found in petitioner's case.

Lower Courts' Analyses

In dismissing this claim, the P.C.R.A. Court emphasized, first, that the Superior Court, on

the direct appeal from petitioner's conviction, stated that "'[n]one of the statements by Eiland or

Mitchell that were presented to the jury referred to appellant or directly implicated him in any

way.'" OPINION, 9, *quoting* Commonwealth v. Eley, No. 1667 MDA 2001 at pages 10-11.

What the P.C.R.A. Court ignored are the following points:

- The language cited is *dictum* as the issue of the degree of redaction was not before the

  Panel. Rather, the Panel was addressing the distinct issue of severance.

- The fact that petitioner was not "directly implicated" by the statements does not resolve

  whether the statements implicated him *in some fashion* sufficient to establish a

  Confrontation Clause violation.

- The Panel did not have before it the claim that the prosecutor used the codefendant's

  statement to argue the guilt of all of the defendants:

> There's a little interesting way to connect the evidence. Think
> about it this way: Jennifer McDonald is asked what she saw. She
> was by Miss Camille's house and the abandoned house in the
> vacant lot.

> Did you see them with any firearms?

> No, I didn't see any guns.

38

> **Edward Mitchell says, *We* were keeping our firearms in the
> abandoned house. So *they're* standing right there. The guns
> are in the abandoned house, and of course *they're* not going to
> have them on them.**

N.T. 624 (emphases added).[20]

The P.C.R.A. Court also sought to defend its position by reference to its jury charge,

which contained a directive to not use one defendant's statement against the others. OPINION,

9. Reliance on this is also error.

First, the P.C.R.A. Court fails to acknowledge the confusing nature of its instruction, to

wit, that statements of the other defendants could not be used "as evidence *against the statement*

*of Kariem.*" N.T. 648. However, even more critical is the fact that the Judge, who did not give

this instruction contemporaneously with the introduction of the statements, limited it to

statements made *to police.*

> Earlier in the trial you heard me give you an instruction regarding
> a statement - - several statements - - that were made by one or
> more of the defendants, and I want to repeat that instruction to you
> now. **This involves any statement by an individual *to the police.***

N.T. 648 (emphasis added). Thus, the trial judge's purported limiting instruction did not reach

the statements allegedly made by the codefendants to two persons in prison.[21]

---

[20]     A portion of the prosecution closing is contained in the paginated complete set of
notes. A separate volume contains the entirety of the prosecution closing. That discrete volume,
marked "Transcript of Proceedings - Closing Statement if Commonwealth," has this statement
recorded at page 21.

[21]     This error was compounded when trial counsel failed to object to the instruction
that the contradictory statement of *any* defendant could be evidence of the consciousness of guilt
of *all* of the defendants. "[I]f you believe there were, in fact, contradictory statements to the
police, you may consider it as tending to prove **the defendants'** consciousness of guilt..." N.T.
644. NO principle of law permits a codefendant's statements to police to be evidence of a non-
declarant's consciousness of guilt. This instruction, both standing alone and in conjunction with

The failure to acknowledge the prosecutor's use of the statements against all defendants makes the P.C.R.A. Court's decision one that resulted "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings[,]" 28 USC §2254(d)(2), and thus permits *de novo* review and a grant of relief. As well, as the P.C.R.A. Court did not adjudicate this claims on the merits, this Court is entitled to engage in *de novo* review of this claim. *See, e.g.*, Walker v. True, 399 F.3d 315, 319 (4th Cir. 2005).

Even without *de novo* review, the P.C.R.A. Court's analysis is contrary to and/or an unreasonable application of settled federal law. The merits analysis set forth above makes it clear that petitioner's right of confrontation was violated by the admission *and prosecutorial use* of his codefendants' post-arrest statements.

The Pennsylvania Superior Court took a similar tack. It resurrected its direct appeal OPINION, which addressed the severance claim, and repeated the contention (shown above th be factually incorrect) that "[n]one of the statements by Eiland or Mitchell that were presented to the jury referred to [petitioner] or directly implicated him in any way." Commonwealth v. Eley, No. 896 MDA 2006 (May 4, 2007), Memorandum Opinion at 14. As was shown above, the failure to acknowledge the prosecutor's use of the statements against all defendants makes the Superior Court's decision one that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings[,]" 28 USC §2254(d)(2), and thus permits *de novo* review and a grant of relief. And, for the same reasons as are set forth above, it is contrary

---

the aforementioned Bruton instruction error, again permitted petitioner to be convicted based on the acts and words of codefendants *after* any alleged conspiracy had terminated. In a case where the defense of non-involvement was presented, counsel could have no strategic basis for permitting third party conduct to implicate his client. Here, too, counsel offered no valid reason for his failure to object. Counsel explained that he did not object because "[i]t hit me that they were talking about the people that made the statements." N.T.E. 37.

to or an unreasonable application of settled decisional law of the United States Supreme Court.

Trial counsel offered no valid explanation for his inaction here. He offered no explanation for his failure to object to the nature of the redacted statements or their use at trial. Given the demonstrated constitutional deficiency in the *admissible* evidence against petitioner, the introduction of the codefendant statements, their substantive use by the prosecutor in closing argument as evidence directly inculpating petitioner, and the erroneous and belated instruction of the trial court, petitioner has proved both deficient performance and harm.

## CONCLUSION

WHEREFORE, for the reasons contained herein, petitioner requests this Court to grant

the instant Petition and order him discharged (under the *Jackson* claim) or order him a new trial.

Respectfully submitted,

Kareem Eley
  A.k.a. Kareem Ellery
EQ-5472
660 State Route 11
Hunlock Creek, Pa. 18621